**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| FLIGHTAWARE LLC,<br><br>                    Plaintiff,<br><br>    - against -<br><br>KALSHI INC., KALSHIEX LLC, KALSHI KLEAR INC., and KALSHI KLEAR LLC,<br><br>                    Defendants. | Case No.: 1:26-cv-06824<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br> **JURY TRIAL DEMANDED** |

Plaintiff FlightAware LLC ("Plaintiff" or "FlightAware"), by and through its undersigned attorneys, brings this Complaint against Kalshi Inc., KalshiEX LLC, Kalshi Klear Inc., and Kalshi Klear LLC (together, "Kalshi" or "Defendant") for injunctive relief and damages.[1] FlightAware alleges upon knowledge with respect to its own actions, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.      Kalshi is using FlightAware's data and name to run gambling markets on flight cancellations. Despite entering into a binding agreement not to use FlightAware's data for commercial purposes, including in connection with gambling or prediction markets, Kalshi has built flight-cancellation betting pages verified by FlightAware's data, displayed FlightAware's registered trademark on the betting pages and connected to the settlement of its betting contracts, and continued after FlightAware demanded that it stop.

---

[1] Plaintiff incorporates by reference the materials supporting its Motion for a Temporary Restraining Order, attached here as Exhibit A (Dec. of Ian Galloway in Supp. of Pl.'s Mot. for a Temporary Restraining Order) and Exhibit B (Dec. of William A. Maher in Supp. Of Pl's Mot. for a Temporary Restraining Order).

2.      FlightAware operates the world's largest flight-tracking platform on which airlines, aircraft operators, and millions of travelers rely. Kalshi operates what it calls "prediction markets" that earn Kalshi transaction fees. Customers "wager" on future events like elections, sports, and government decisions. Kalshi describes these "prediction markets" as financial products. The New York Times has described these markets as "essentially gambling sites." State authorities agree. Forty-four state attorneys general have told the Commodity Futures Trading Commission ("CFTC") that sports-event contracts are "sports bets and gambling." New York filed an eight-count civil suit seeking an injunction against sports bets, joining many other states that have filed for injunctive relief against the same.

3.      On July 14, 2026, Kalshi extended these markets to commercial aviation. It announced markets allowing customers to bet on flight cancellations nationwide and at particular airports—events that can strand travelers, disrupt airline operations, and threaten safety. Kalshi named FlightAware as the "Primary Source Agency," displayed the registered FlightAware trademark, linked to FlightAware's website, and stated that the outcome of the bets is "verified from FlightAware." FlightAware learned of these markets and their reliance on FlightAware's data and trademarks only when reporters called for comment.

4.      Public reaction was swift and severe: there was widespread outrage and concern that the markets would incentivize unsafe tactics to impact cancellations, threatening public safety and creating the potential for massive disruption of air travel. Airlines condemned the markets. And due to Kalshi's unauthorized use of FlightAware's data and mark, customers immediately assumed that FlightAware was involved in the scheme.

5.      Kalshi never informed FlightAware that it would rely on FlightAware's data to determine the outcome of these betting markets, a necessary element of those markets. As soon as

FlightAware learned of Kalshi's illicit behavior, FlightAware immediately sent cease-and-desist letters. Despite these notifications, Kalshi continues to offer bets on cancelled flights to this day, broadcasting that the bets are "verified from FlightAware," even though Kalshi's own filings identify other data that could settle them. This action is brought to stop Kalshi's illicit behavior before there is any harm to public safety.

## PARTIES

6.      Plaintiff FlightAware LLC is a digital aviation company and operates the world's largest flight-tracking and data platform. With global connectivity to every segment of aviation, FlightAware provides over 10,000 aircraft operators and service providers, as well as over 13,000,000 passengers, with global flight-tracking solutions, predictive technology, analytics, and decision-making tools.

7.      FlightAware is a limited liability company organized under the laws of Texas with its principal place of business at 11 Greenway Plaza, Suite 2900, Houston, Texas 77046.

8.      Defendant Kalshi Inc. is a Delaware corporation headquartered in New York, New York. Kalshi Inc. is the parent company of all other Kalshi entities. Together with the other Kalshi entities, Kalshi Inc. operates a "prediction market," allowing consumers to place wagers.

9.      Defendant KalshiEX LLC is a Delaware corporation headquartered in New York, New York. KalshiEX is a "contract market" or an "exchange," and is a wholly owned subsidiary of Kalshi Inc.

10.      Defendant Kalshi Klear Inc. is a Delaware corporation headquartered in New York, New York. Kalshi Klear Inc. is a wholly owned subsidiary of Kalshi Inc. Kalshi Klear Inc. is the holding company for Kalshi Klear LLC, which operates Kalshi's in-house clearinghouse.

11. Defendant Kalshi Klear LLC is a Delaware limited liability corporation headquartered in New York, New York. Kalshi Klear LLC is an in-house clearinghouse for KalshiEX LLC, and is a wholly owned subsidiary of Kalshi Klear Inc.

**JURISDICTION AND VENUE**

12. FlightAware seeks damages, injunctive, and other equitable relief against each of the Defendants.

13. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a), and 1367.

14. The Court has general personal jurisdiction over the Kalshi Defendants because they maintain their principal place of business and operational headquarters in New York, New York, and because they regularly conduct business within this District. The Kalshi Defendants' executive leadership, corporate-decision making, and core operational functions are directed and controlled from this District. Accordingly, the Kalshi Defendants are "at home" in New York.

15. The Court also has specific personal jurisdiction over all Defendants because the wrongful conduct by the Defendants occurred in, and emanated from, this District. Defendants designed, developed, operated, and controlled the Kalshi platform, its policies, payment systems, and the challenged practices at issue from its New York headquarters. The misconduct alleged herein emanated from decisions and conduct occurring in this District. FlightAware's injuries are directly traceable to these New York-based decisions and conduct.

16. Kalshi purposefully availed itself of the privilege of conducting business in the New York market by maintaining their corporate headquarters in this District, employing personnel here, directing platform operations from this District, engaging in continuous and systematic business activities here, and intentionally causing effects within and outside New York, including to FlightAware. Defendants offer Kalshi's betting services in New York and to consumers nationwide.

17. Moreover, Kalshi actively disseminates targeted marketing and advertisements within the state with the intent of promoting and selling their products and services to consumers in this District. As such, Kalshi conducts business with sufficient minimum contacts in New York, and/or otherwise intentionally avails itself to the New York market.

18. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Kalshi resides in this District within the meaning of 28 U.S.C. § 1391(c). Venue is also proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to FlightAware's claims occurred in, and emanated from, this District and involve commerce that flows to and from this District.

## FACTUAL BACKGROUND

### I. FlightAware's Extensive Geolocation Data Network

19. FlightAware is a digital aviation company that operates the world's largest flight-tracking platform. FlightAware provides global flight-tracking solutions, predictive technology, analytics, and decision-making tools through its website and mobile application.

20. FlightAware's customers include more than 13,000,000 passengers and more than 10,000 aircraft operators and service providers. Passengers rely on FlightAware to plan travel, look up historical flight performance data, and learn when flights may arrive or depart after delays. Commercial airlines are also an important part of FlightAware's customer base, as they use FlightAware's superior geolocation information in order to plan their operations.

21. FlightAware maintains an extensive network of resources to provide this data to its customers.

22. FlightAware receives aircraft location data from Automatic Dependent Surveillance-Broadcast ("ADS-B"), which is technology by which aircraft in flight publicly broadcast their positions to those with technology to receive such data. To receive ADS-B data,

FlightAware has grown and maintains a network of over 40,000 physical antennas around the world to receive this information.

23.     FlightAware additionally licenses ADS-B data from commercial entities with satellite receivers that can receive ADS-B data where FlightAware cannot deploy terrestrial receptors, such as in geopolitically unstable regions and over the ocean. These companies license such data to FlightAware in exchange for payment pursuant to contracts between the companies. FlightAware is subject to certain contractual limitations on its use of the data it receives from such third parties.

24.     FlightAware uses flight plan information to supplement its use of ADS-B data to provide superior flight-tracking solutions. Certain commercial airlines voluntarily supply their flight plan data directly to FlightAware, as they are customers of FlightAware benefiting from FlightAware's aggregation of data.

25.     FlightAware additionally receives flight plan data from various government agencies, including the Federal Aviation Administration ("FAA"), the European Organization for the Safety of Air Navigation ("Eurocontrol"), and more than 40 additional Air Navigation Service Providers ("ANSP"). To receive flight plan data, FlightAware relies on airlines' voluntary disclosure of plans and ANSP permission to access flight feeds, which can be revoked, and have different stipulations on use.

26.     FlightAware also has commercial agreements with other aggregators of flight status information, to supplement the quality of various data elements. These agreements place certain limitations on FlightAware's use of the subject data.

27.     FlightAware's ability to provide data to its customers depends on access to each one of these sources. Customers value the speed and accuracy of FlightAware's data collected

from a variety of sources that are augmented with both public data and FlightAware's own ADS-B network. FlightAware invests heavily in compiling, evaluating, and aggregating the data through its proprietary process before securely providing it to customers and the public. Out of FlightAware's 90 employees working to support, maintain, and expand FlightAware's network, FlightAware employs 75 software engineers, data analysts, IT infrastructure engineers, and other technicians to facilitate this process.

28.     FlightAware's competitive advantage lies in the investments it makes in maintaining comprehensive data sources through mutually beneficial relationships with its airline customers, verifying the accuracy of that data, and synthesizing it for consumption by its customers and the public.

29.     In connection with its provision of a database with comprehensive flight-tracking information, FlightAware has a registered trademark, FlightAware®.

**II.     FlightAware's Protection of its Data.**

30.     FlightAware provides certain limited data to the public through its website.

31.     The Terms of Use governing "all use" of FlightAware's website and "all content, services and products available through the Website or FlightAware applications for mobile, or use of software provided by FlightAware," are hyperlinked at the foot of every page on the website.[2]

32.     The Terms of Use specify that "[b]y accessing or using the Website and FlightAware Services, you agree that you have read, understood and have become legally bound

---

[2] FlightAware, *Terms of Use*, https://www.flightaware.com/about/terms-of-use (last visited Aug. 10, 2026).

by the following terms and conditions. If you do not agree to these terms and conditions do not access or use this Website".

33.    Kalshi similarly links its own terms of use at the bottom of their webpages, that purport to bind their own customers in a similar manner.[3]

34.    FlightAware's Terms of Use have been in operation since 2008 and since 2024, have specified the following:

   a.    **Term 9**: "You may not modify the Website or any materials in any way, reproduce, publicly display, perform, distribute, create derivative works of, or otherwise use the Website and any materials for any public or commercial purpose, except as otherwise specifically permitted herein."

   b.    **Term 11**: "You may not use the Website for any aviation, commercial, operational, law enforcement, judicial, or safety-critical activity that relies on the availability, validity, or accuracy of FlightAware data."

   c.    **Term 19**: "All no-charge, web-based FlightAware products, APIs, and data are licensed solely for personal use, and you may not use them for any other purpose."

Previous versions of the Terms of Use contain substantially similar provisions.

35.    Although FlightAware's existing terms already prohibited Kalshi from using FlightAware's data to run a commercial prediction market, FlightAware amended the Terms of Use on July 16, 2026, to eliminate any unfounded claim that prediction markets fell outside those restrictions. The updated terms specify that the user "shall not use . . . FlightAware products, API, and any data licensed through FlightAware products, any analyses, models, or other outputs derived from the Website, FlightAware products, API, and any data licensed through FlightAware products, in connection with any betting, wagering, gambling, prediction market, event contract,

---

[3] Kalshi, *Data Terms of Use,* https://kalshi-public-docs.s3.amazonaws.com/kalshi-data-terms-of-service.pdf (last visited Aug. 10, 2026) ("All access and use of Kalshi Data is subject to these Kalshi Data Terms of Use.").

or similar platform or product that enables participants to place, trade, or settle positions based on the occurrence or outcome of future events."

36. The Terms of Use further identify FlightAware® as a registered trademark of FlightAware LLC and provide that all intellectual property and content associated with FlightAware belongs exclusively to FlightAware and its affiliates. Unless expressly authorized, users may not copy, reproduce, distribute, modify, sell, or create derivative works from FlightAware content.

37. FlightAware's Terms and Conditions also "govern the sale, delivery, acceptance, and subsequent use of FlightAware Data and services."[4]

38. FlightAware users may sign up for a free user account by signing up through Google, Apple, or by using their email address. Every user is required to click to manifest their assent to those Terms of Use before creating their account:

---

[4] FlightAware, *FlightAware Terms and Conditions*, https://www.flightaware.com/commercial/flightaware-terms-conditions-Jul2026.pdf (July 2026).

9



39.     FlightAware permits certain users to access its application programming interface ("API"). The API allows users to access more detailed raw data for manipulation and analysis.

40.     Users who wish to access FlightAware's API must first sign up for an account and register for an "AeroAPI" account. There are three tiers of AeroAPI Accounts: Personal, Standard, and Premium. Each tier carries different privileges and permissions, which are detailed in the corresponding License Agreement.

41.     A Personal AeroAPI account is free to use. Since at least 2022, the "Personal" License Agreement has permitted use of AeroAPI data for personal purposes only and prohibited the "[u]se [of] AeroAPI . . . in furtherance of any business, whether for profit or otherwise."[5]

---

[5] FlightAware, *AeroAPI Personal License Agreement*,
https://www.flightaware.com/commercial/aeroapi/AeroAPI_Personal_License_Jul2026_v2.pdf
(July 2026).

42. On July 16, 2026, FlightAware updated the Personal License Agreement to specify that the holder of a Personal License Agreement "[s]hall [n]ot . . . use AeroAPI [or] AeroAPI data . . . in connection with any betting, wagering, gambling, prediction market, event contract, or similar platform or product."

43. Standard and Premium AeroAPI accounts require monthly payment from the user. Standard and Premium AeroAPI accounts additionally permit the user to use FlightAware's data for certain limited commercial purposes. Standard and Premium AeroAPI accounts require the user to pay FlightAware for access to the data, and, in exchange, offer certain permissions to users not granted to Personal AeroAPI account holders.

44. Registering for an AeroAPI account of any tier requires the user to accept FlightAware's Terms of Use, Terms and Conditions, and the License Agreement corresponding to their account tier.

45. As shown below, a user cannot complete registration for an account before accepting the Terms of Use.

 

46.    After accepting the Terms of Use and clicking "Finish," a user registering for an API account is redirected to a page confirming agreement to the AeroAPI Personal License and FlightAware's Terms and Conditions. As shown below, the user cannot proceed to their account until they accept both the terms of the AeroAPI Personal License and the Terms and Conditions.





47.     Defendant Kalshi signed up for a Personal AeroAPI account on July 14, 2022. Defendant Kalshi could not have signed up for the account without accepting the Terms of Use, Terms and Conditions, and AeroAPI Personal License Agreement.

48.     On July 14, 2026, Casey Breen, a Kalshi employee, created a free User Account using a Kalshi email address. Mr. Breen could not have signed up for the User Account without accepting the Terms of Use.

49.     Publicly available information shows that Mr. Breen is an attorney who "work[s] on market specification and operations at Kalshi" by "helping define rules/strikes, support listings, and ensure clear, consistent resolutions."[6]

---

[6] *Casey Breen*, LinkedIn, https://www.linkedin.com/in/caseybreen/ (last visited Aug. 10, 2026).



### III.    FlightAware's Trademarks and Reputation

50.    FlightAware owns a federally registered trademark, FlightAware®, United States Registration No. 3,222,789. FlightAware applied to register the FlightAware mark on May 31, 2006. The United States Patent and Trademark Office registered the mark on the Principal Register on March 27, 2007. The registration covers commercial and non-commercial flight-tracking services. In 2012, after more than five consecutive years of continuous use following registration, FlightAware filed a Combined Declaration of Use and Incontestability under Sections 8 and 15 of the Lanham Act.



Int. Cl.: 39

Prior U.S. Cls.: 100 and 105

**United States Patent and Trademark Office**    Reg. No. 3,222,789
Registered Mar. 27, 2007

**SERVICE MARK
PRINCIPAL REGISTER**

# FlightAware

FLIGHTAWARE, LLC (TEXAS LTD LIAB CO)
2450 LOUISIANA STREET, SUITE 400-510
HOUSTON, TX 77006

   FOR: COMMERCIAL AND NON-COMMERCIAL FLIGHT TRACKING SERVICES, NAMELY, PROVIDING ARRIVAL, DEPARTURE, AND REAL-TIME POSITION INFORMATION FOR COMMERCIAL AND NON-COMMERCIAL FLIGHTS, IN CLASS 39 (U.S. CLS. 100 AND 105).

FIRST USE 9-30-2005; IN COMMERCE 9-30-2005.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

SER. NO. 78-897,299, FILED 5-31-2006.

ALICE BENMAMAN, EXAMINING ATTORNEY

14

51.     FlightAware also owns United States Registration No. 6,105,770 for the stylized FlightAware® mark. The registered mark consists of the word FlightAware together with an airplane-and-flight-path design incorporated into the lettering. The registration issued on July 21, 2020, and covers services in Classes 38, 39, and 42.



| | |
|---|---|
| **Reg. No. 6,105,770** | FlightAware LLC (TEXAS LIMITED LIABILITY COMPANY) Eleven Greenway Plaza, Suite 2900 Houston, TEXAS 77046 |
| **Registered Jul. 21, 2020** | |
| **Int. Cl.: 38, 39, 42** | CLASS 38: Providing access to an on-line computer database featuring information on flight tracking and air transportation; data as a service (DAAS), namely, providing access to data stored electronically in central files for remote consultation and multiple-user access in the field of flight tracking and air transportation |
| **Service Mark** | |
| **Principal Register** | FIRST USE 12-5-2006; IN COMMERCE 12-5-2006 |

52.     Those services include providing access to online databases containing flight-tracking and air-transportation information; providing flight and aircraft tracking, flight-status, and historical-flight data; providing flight-tracking information through websites and mobile applications; providing API software through which users may obtain flight-tracking data; and providing software for analyzing, mining, and reporting such data. FlightAware has used the registered mark in commerce in connection with those services since at least December 5, 2006. In 2026, FlightAware filed a Combined Declaration of Use and Incontestability under Sections 8 and 15 of the Lanham Act for Registration No. 6,105,770.

53.     Since at least 2005, FlightAware has continuously and exclusively used the FlightAware marks in connection with its flight-tracking, flight-information, and aviation-data services. During that period, FlightAware has offered its services under the FlightAware marks to commercial airlines, aircraft operators, aviation professionals, travelers, media organizations, and

other members of the public throughout the United States and around the world. Exemplary uses of the FlightAware marks appear below.



54.     FlightAware has invested substantial resources in developing, maintaining, and promoting the services offered under the FlightAware mark. Those investments include the extensive physical and technological infrastructure, commercial relationships, and personnel necessary to collect, verify, synthesize, and distribute timely, accurate and comprehensive aviation information to FlightAware's customers and the public.

55.     The services offered under the FlightAware marks have achieved substantial commercial success and are used by millions of people. On average, approximately 6.34 million unique users visit FlightAware's website each week, generating approximately 15 million events and 50 million page views. During calendar year 2026, FlightAware's website recorded approximately 183 million events and 610 million page views.

56.     FlightAware's mobile application likewise has a substantial user base. Across the iOS and Android platforms, approximately 1.1 million unique users accessed the application during a recent seven-day period, and approximately 2.5 million unique users accessed it during

a recent thirty-day period. FlightAware also distributes a weekly newsletter to approximately 7.49 million recipients.

57.    FlightAware's strong reputation is also reflected in the reviews of its mobile application. The application has a 4.9-out-of-5 rating in Apple's App Store based on approximately 380,000 ratings.



58.    Reviewers repeatedly praise FlightAware as accurate, reliable, and authoritative, describing it as the "best app in the business," the "most reliable" source of updated flight information, and more current than airline applications and airport flight boards. Other reviewers emphasize that FlightAware delivers comprehensive information quickly and accurately. Exemplary reviews appear below. These reviews further reflect the broad recognition of the FlightAware marks and the public's association of those marks with accurate and dependable flight information.[7]

---

[7] Meanwhile, reviews of Kalshi's application in Apple's App Store reflect that many consumers understand Kalshi to be a betting platform. For example, one review, titled "More fun than a free hooker in Vegas," states: "This is so much fun and you can bet on literally anything. So far I've been winning 8 out of 10 times."



59.      National and aviation-industry media organizations regularly identify FlightAware by name as the source of information concerning flight locations, delays, cancellations, and other aviation events. For example, CBS relied on FlightAware in reporting about the impact of the government shutdown on travel delays on November 3, 2025; Business Insider identified FlightAware's "MiseryMap" as a source for users to understand the impact of flight cancellations on holiday travel on December 27, 2022; and PBS directed travelers to FlightAware for information on the impact of staffing shortages on flight cancellations on December 25, 2021.[8]

---

[8] *See* CBS, *Brace for more air travel delays as government shutdown drags into second month, experts say* (Nov. 3, 2025), https://www.cbsnews.com/news/airlines-airports-delays-tsa-air-traffic-control-government-shutdown/ (last visited Aug. 10, 2026); Business Insider, *This map shows which airports in the US are the worst to fly out of right now* (Dec. 27, 2022), https://www.businessinsider.com/flight-cancellations-delays-misery-map-southwest-flightaware-holiday-travel-2022-12 (last visited Aug. 10, 2026); PBS, *Flight cancellations drag on as airlines short-staffed* (Dec. 25, 2021), https://www.pbs.org/newshour/world/flight-cancellations-drag-on-as-airlines-short-staffed (last visited Aug. 10, 2026). *See also* The Points Guy, *How to track where your plane is coming from before your flight* (Jan. 24, 2025), https://thepointsguy.com/travel/how-to-track-airplane/ (last visited Aug. 10, 2026).

18

This unsolicited coverage has exposed FlightAware's marks to millions of travelers and aviation consumers.



Airlines like Southwest have canceled or delayed thousands of flights in recent days. Courtesy of FlightAware.

60.    FlightAware has a strong history of excelling at integration arrangements, as evidenced by the number of media sites using FlightAware as well as other partnerships, such as being the official flight-tracking service of the Boeing 787 and Boeing 747-8. Such uses further expose consumers to FlightAware's marks and reinforce its association with accurate and reliable aviation information.

61.    As a result of FlightAware's widespread, continuous, and exclusive use of the FlightAware mark, its substantial investments in the services offered under the mark, the commercial success of those services, and the mark's extensive exposure to millions of users, FlightAware has acquired valid and subsisting federal and common-law rights in the marks, together with substantial goodwill. FlightAware has filed declarations of incontestability under Section 15 of the Lanham Act for both federal registrations. Travelers, aviation professionals,

aircraft operators, airlines, data providers, and media organizations recognize FlightAware's marks as identifying a single source of flight-tracking and aviation-information services. Those consumers associate FlightAware's marks with accurate, reliable, neutral, and authoritative aviation information.

62.    FlightAware's reputation and the recognition of FlightAware's marks have led third parties to invoke FlightAware's name or copy FlightAware's website in attempts to lend legitimacy to their own activities. In 2006, for example, a company called Connect-A-Jet publicly claimed that it was affiliated with FlightAware and other established aviation companies, even though FlightAware had no relationship with Connect-A-Jet and had not authorized that claim. FlightAware has encountered other unauthorized uses of its name, mark, website, and content. In 2021, for example, a website reproduced FlightAware's ADS-B webpage, including FlightAware's branding, navigation, text, graphics, and copyright notice, in a manner that made the website appear to be operated by FlightAware. FlightAware investigated these and other unauthorized uses and took steps to protect its rights and preserve its control over the FlightAware mark.

63.    FlightAware has expended substantial time, money, and resources developing, maintaining, and improving the flight-tracking platform and services offered under the FlightAware mark. Those investments have created substantial and valuable goodwill. FlightAware's customers, data providers, and members of the traveling public rely on FlightAware and FlightAware's marks as trusted sources of accurate aviation information.

64.    FlightAware's business depends on the accuracy and reliability of its information and on the trust of its customers, data providers, and the traveling public.

20

65.    FlightAware's role is to collect, verify, and report aviation information accurately and objectively. FlightAware has no financial interest in whether any particular flight is timely, delayed, or cancelled, and the accuracy of its reporting does not depend on any particular outcome. Airlines, aircraft operators, aviation professionals, media organizations, and travelers rely on FlightAware to provide an independent account of flight locations, delays, and cancellations when making operational, travel, and reporting decisions.

66.    FlightAware's reputation for neutrality and reliability depends in part on its independence from the aviation events it reports. FlightAware does not encourage, reward, or provide financial incentives for any person to cause a flight to be delayed or cancelled.

67.    FlightAware has carefully protected the reputation associated with the FlightAware mark. FlightAware does not authorize the use of FlightAware's marks in connection with betting, wagering, gambling, prediction markets, or other products that create incentives to interfere with aviation operations.

68.    FlightAware has never operated, sponsored, promoted, or participated in a market that permits customers to wager on whether flights will be delayed or cancelled. Nor has FlightAware authorized any person to use FlightAware's marks to solicit or resolve such wagers.

## IV.    Kalshi's Gambling Markets Create Incentives for Manipulation

69.    Kalshi operates what it calls a "prediction market." The premise is simple, Kalshi lists questions about future events and customers put money on the answer: which candidate will win, whether a team will prevail, how hot a city will be, or what a public official will say. A customer who selects the correct outcome receives a payout; a customer who selects the wrong one loses the amount wagered. The company calls the wagers "trades" and the instruments "event

21

contracts." In practical terms, however, customers are betting money on uncertain events, such as whether the Dallas Cowboys will beat the New York Giants in the opening NFL game.[9]



In other words, as the New York Times has put it, prediction markets are "essentially gambling sites."[10]

---

[9] Kalshi, *DAL Cowboys vs NY Giants*, https://kalshi.com/markets/kxnflgame/professional-football-game/kxnflgame-26sep13dalnyg (last visited Aug. 10, 2026).

[10] New York Times, *What Are Prediction Markets, and Why Are They Causing Controversy?* (Apr. 24, 2026), https://www.nytimes.com/2026/04/24/business/what-are-prediction-markets.html (last visited Aug. 10, 2026).

70.     State regulators have reached the same conclusion. In July 2026, a bipartisan coalition of 44 state attorneys general told the Commodity Futures Trading Commission ("CFTC") that sports-event contracts offered on prediction markets are "sports bets and gambling" subject to state law, not contracts that may be traded on federally regulated exchanges.[11] Several states have taken direct action against Kalshi under their gambling laws. A Nevada court has barred Kalshi from offering sports-, election-, and entertainment-related contracts in the State.[12] And on July 31, 2026, New York became the latest state to file suit to enjoin sports betting by filing an eight-count civil suit against Kalshi, alleging it runs an illegal gambling operation.[13]

71.     Those regulatory challenges have done little to slow the industry's growth. Billions of dollars change hands on prediction markets each week. Kalshi reportedly controls approximately 90% of the United States market and claims roughly two million monthly users.[14] It earns transaction fees on the wagers placed through its platform. In May 2026, Kalshi raised

---

[11] CNBC, *44 states are aligned on one thing in their fight against prediction markets. It's about sports wagering* (July 28, 2026), https://www.cnbc.com/2026/07/28/44-states-say-cftc-has-no-authority-over-sports-prediction-markets.html (last visited Aug. 10, 2026).

[12] Law360, *Kalshi To 'Geofence' Nevada After Regulators Expose Gap* (July 27, 2026), https://www.law360.com/articles/2506304/kalshi-to-geofence-nevada-after-regulators-expose-gap (last visited Aug. 10, 2026).

[13] New York Attorney General, *Governor Hochul and Attorney General James Announce New York has Sued Kalshi for Running Illegal Gambling Operation* (July 31, 2026), https://ag.ny.gov/press-release/2026/governor-hochul-and-attorney-general-james-announce-new-york-has-sued-kalshi (last visited Aug. 10, 2026).

[14] New York Times, *Kalshi, the Prediction Market, Is Now Valued at $22 Billion* (May 7, 2026), https://www.nytimes.com/2026/05/07/business/dealbook/kalshi-fundraise-22-billion.html; (last visited Aug. 10, 2026). CNBC, *Kalshi, Polymarket lobby as insider trading, betting eyed by Congress* (Apr. 15, 2026), https://www.cnbc.com/2026/04/15/kalshi-and-polymarket-congress-regulation-washington-influence.html (last visited Aug. 10, 2026).

$1 billion at a valuation of $22 billion.[15] At the time, it reported annualized trading volume of $178 billion, more than triple the figure six months earlier, and annualized revenue exceeding $1.5 billion.[16]

72.    As the markets have expanded, so have concerns about what they reward. A prediction market does not merely invite customers to anticipate an event. It gives anyone who knows the outcome in advance, or who can influence that outcome, a direct financial incentive to exploit that advantage.

73.    Sometimes those concerns arise in relatively benign settings, like television or music. When Kalshi and its competitor Polymarket offered markets on the winner of *Survivor* Season 50, the apparent certainty of the betting spoiled the result for viewers and raised concerns that someone with advance knowledge had leaked it for profit.[17] Survivor host Jeff Probst put the incentive plainly: the platforms were "incentivizing people to lie, cheat and steal to get ahead." [18] A similar concern arose on Kalshi when users bet on which song would top Spotify's daily chart.

---

[15] New York Times, *Kalshi, the Prediction Market, Is Now Valued at $22 Billion* (May 7, 2026), https://www.nytimes.com/2026/05/07/business/dealbook/kalshi-fundraise-22-billion.html (last visited Aug. 10, 2026).

[16] New York Times, *Kalshi, the Prediction Market, Is Now Valued at $22 Billion* (May 7, 2026), https://www.nytimes.com/2026/05/07/business/dealbook/kalshi-fundraise-22-billion.html (last visited Aug. 10, 2026).

[17] *See* Variety, *'Survivor' Boss Jeff Probst Says Kalshi and Polymarket Are 'Incentivizing People to Lie, Cheat and Steal'; Kalshi is Now Considering Measures to Prevent Spoilers (EXCLUSIVE)* (May 22, 2026), https://variety.com/2026/tv/news/survivor-jeff-probst-kalshi-polymarket-spoilers-1236757354/ (last visited Aug. 10, 2026).

[18] *See Id.*

After Malcolm Todd's "Earrings" surged to No. 1, Spotify removed streams it did not believe came from genuine listeners, and Kalshi opened an investigation.[19]

74.    But increasingly, the same concerns have arisen in matters of far greater consequence. Kalshi now permits wagers on whether the Food and Drug Administration will approve particular cancer drugs and plans to offer markets on whether clinical trials will succeed. Physicians, researchers, and patients have warned that such markets could compromise studies, encourage trading on confidential results, and erode trust in the drug-development process. A petition urging regulators to crack down on such betting warned that it "threatens the very foundation of trust and integrity in biotechnology."[20]

75.    The risks surrounding prediction markets have already produced allegations of serious misconduct and other troubling warning signs. On Polymarket, Kalshi's principal rival, an Army Special Forces soldier allegedly used classified information about the operation to capture Venezuelan President Nicolás Maduro to place wagers that earned him more than $400,000.[21] Before the United States struck Iran, hundreds of unusual bets appeared predicting that an attack was imminent; the strikes followed, the wagers paid out, and the timing and concentration of the trading raised concerns that some bettors may have possessed advance information.[22] And on

---

[19] CBS News, *Spotify removes streams of No. 1 song after suspicious Kalshi bets* (July 2, 2026), https://www.cbsnews.com/news/spotify-earrings-malcolm-todd-kalshi-investigation/ (last visited Aug. 10, 2026).

[20] New York Times, *Should You Be Able to Bet on Drug Trials?* (July 28, 2026), https://www.nytimes.com/2026/07/28/business/kalshi-polymarket-prediction-market-drugs.html (last visited Aug. 10, 2026).

[21] New York Times, *What Are Prediction Markets, and Why Are They Causing Controversy?* (Apr. 24, 2026), https://www.nytimes.com/2026/04/24/business/what-are-prediction-markets.html (last visited Aug. 10, 2026).

[22] New York Times, *How Anonymous Bettors Cashed In on the Iran Strike, Just Hours Before It Happened* (Mar. 3, 2026), https://www.nytimes.com/2026/03/03/upshot/prediction-markets-iran-strikes.html (last visited Aug. 10, 2026); The Atlantic, *The 'Hair-Dryer Incident' Is Just the Start*

Kalshi itself, a White House teleprompter operator used advance knowledge of President Trump's speeches to win approximately $100,000 by betting on the words the President would say.[23]

76.     The risk is not limited to bettors who possess advance information. A prediction market can also reward someone who alters the event, or the data used to determine its outcome.[24] In April 2026, Polymarket offered wagers on the day's maximum temperature in Paris, based on readings from a weather station at Charles de Gaulle Airport. Shortly after an anonymous trader placed long-shot bets against the result that virtually every other bettor expected, the station recorded a brief, unexplained temperature spike that did not appear at nearby stations. The trader turned a wager of less than $120 into more than $21,000.[25] Weather enthusiasts suspected tampering, Météo-France opened an investigation, and the matter was referred to French police.

77.     These examples reveal the same basic problem. A prediction market places a cash value not only on knowing what will happen, but also on the ability to affect what happens or the data used to record it. A television spoiler, a confidential government decision, a clinical-trial result, or a temperature sensor can all become instruments of a wager. As the prediction-market industry has grown, so has the risk that its financial incentives will distort the events on which customers bet, as well as public concern about that distortion.

---

(July 20, 2026), https://www.theatlantic.com/technology/2026/07/prediction-market-outsider-trading/687975/ (last visited Aug. 10, 2026).

[23] New York Times, *White House Teleprompter Operator Bet on Trump Speeches, Kalshi Says* (July 16, 2026), https://www.nytimes.com/2026/07/16/technology/teleprompter-operator-kalshi-trump-speeches.html (last visited Aug. 10, 2026).

[24] Wall Street Journal*, Did a Mystery Trader Tamper With the Temperature to Win Big on Polymarket?* (Apr. 23, 2026), https://www.wsj.com/business/unusual-weather-bets-on-polymarket-spur-french-investigation-b799bec8 (last visited Aug. 10, 2026).

[25] *Id.*

**V.        Kalshi's Unauthorized Use of FlightAware's Data and Marks**

78.        On July 14, 2026, Kalshi filed a self-certification with the U.S. Commodity Futures Trading Commission ("CFTC") that enabled it to solicit bets on the percentage of scheduled flights that would be cancelled out of an individual airport in a particular time period, identifying FlightAware as the "Primary Source Agency" used to settle the outcome of those bets.[26] In doing so, Kalshi associated FlightAware and its data with Kalshi's gambling markets without FlightAware's knowledge or consent.

79.        Within hours, national media outlets reported that Kalshi intended to offer those markets and contacted FlightAware for comment. Until it was contacted by media outlets for comment, FlightAware had no knowledge of Kalshi's CFTC self-certifications or its plans to offer flight-cancellation markets.[27]

80.        FlightAware promptly investigated and learned, for the first time, that Kalshi intended to offer these so-called "prediction markets" using FlightAware's data and the FlightAware mark. Kalshi indicated it would use FlightAware's data to determine the outcome of each market, i.e., whether customers' wager had won or lost.

---

[26] When a company self-certifies contracts to the CFTC, it must identify the manner in which they will determine how the contract will settle or pay, including, if relevant, the "Primary Source Agency" used to "settle" the proposed contracts.

[27] On the same day, July 14, 2026, Casey Breen, a Kalshi employee, opened a FlightAware AeroAPI account using his Kalshi email address. *Supra* ¶ 48. As discussed above, Mr. Breen's LinkedIn profile shows that he is a lawyer who works on "market specification and operations at Kalshi," including "helping define rules/strikes" and ensuring "clear, consistent resolutions." *Supra* ¶ 49 n.6. In other words, his stated responsibilities are directly related to selecting the rules and resolution criteria for Kalshi's markets.

81.     Upon further investigation, FlightAware determined that Kalshi had certified "prediction markets" using FlightAware's data as early as July 11, 2022,[28] and that from at least April of 2026, Kalshi has offered other flight-cancellation markets that use FlightAware data through its website.[29] On the pages through which Kalshi solicits bets, Kalshi refers to FlightAware repeatedly. It states that the "[o]utcome [is] verified from FlightAware" and that a flight counts as cancelled only if it is "classified as cancelled by FlightAware as of the expiration time." Kalshi displays the FlightAware mark in bold text and hyperlinks it directly to FlightAware's website. At least initially, Kalshi used FlightAware's mark with no disclaimer.

> Outcome verified from **FlightAware**.
>
> For this market, the relevant value is the number shown in the field labeled "Total cancellations within, into, or out of the United States this week" on FlightAware's live weekly delay and cancellation page at the time of observation. This market resolves based on that figure as checked by the Exchange at 5pm EDT on Jul 17, 2026.

82.     Through its use of FlightAware's mark, Kalshi presents FlightAware as not just a participant in the verification of the market outcome, but as the source on which the market's resolution depends. Kalshi's market rules designate FlightAware's classifications and data as the facts that determine whether a wager wins or loses. Without access to FlightAware's timely and accurate flight data, Kalshi could not settle those contracts or collect the transaction fees they generate. FlightAware, however, does not verify, certify, approve, or determine the outcome of

---

[28] On July 11, 2022, Kalshi filed three self-certifications with the CFTC that would enable it to solicit bets on the number of delays or cancellations at three individual airports, also relying on FlightAware's data. FlightAware had no knowledge of these self-certifications until July 2026.

[29] Kalshi, *US flight cancellations for the week ending at 12pm EDT on 4/20*, https://kalshi.com/markets/kxusflycan/us-flight-cancellations-this-week/kxusflycan-26apr20 (last visited Aug. 10, 2026); Kalshi, *US flight cancellations for the week ending at 12pm EDT on 8/14*, https://kalshi.com/markets/kxusflycan/us-flight-cancellations-this-week/kxusflycan-26aug14 (last visited Aug. 10, 2026).

28

Kalshi's markets. It did not design, administer, sponsor, endorse, or participate in those markets. Nor did FlightAware provide its data to Kalshi for use in resolving wagers. Kalshi instead accessed FlightAware's data without authorization and then represented to customers that market outcomes were "verified from FlightAware." Kalshi has offered several such flight-cancellation markets. In each market, Kalshi has used FlightAware's data to determine the outcome of the market and has used the FlightAware mark multiple times, including to inform customers that FlightAware's data will determine how the wager will be resolved and, therefore, whether their wagers will win or lose. On each page soliciting bets on the timeliness of flights, Kalshi refers to FlightAware multiple times. For example, Kalshi states that the "Outcome verified from FlightAware" and notes that "A flight counts as cancelled only if it is . . . classified as cancelled by FlightAware as of the expiration time."[30]

83.    FlightAware did not authorize Kalshi to use either its data or the FlightAware marks in connection with any of those markets.

84.    Kalshi does not need to use FlightAware's marks or data to offer or resolve its flight-cancellation markets. In its self-certification filing with the U.S. Commodity Futures Trading Commission, Kalshi identified the U.S. Department of Transportation Bureau of Transportation Statistics On-Time Reporting data as an alternative source agency if FlightAware data is unavailable, as shown in the below excerpt. Kalshi can therefore operate these markets without using FlightAware's marks or data.

---

[30] Kalshi, *Will at least 50% of scheduled flights at JFK be cancelled on October 21, 2026?*, https://kalshi.com/markets/kxflycancjfk/jfk-flight-cancellations/kxflycancjfk-jfk-all-26oct21 (last visited Aug. 10, 2026).

**Source Agency:** The primary Source Agency is FlightAware. The secondary Source Agency, applied only if the primary is unavailable or does not publish a usable figure for <time period>, is the U.S. Department of Transportation Bureau of Transportation Statistics (BTS) On-Time Reporting data for <airport>. All instructions on how to access the Underlying are non-binding and are provided for convenience only and are not part of the binding Terms and Conditions of the Contract.

85.    Kalshi profits from this use. Kalshi represents to the public that it "make[s] its money" by "tak[ing] a small fee on each transaction on our platform."[31]

86.    By using FlightAware's data to solicit and resolve wagers from which Kalshi earns transaction fees, Kalshi violated the AeroAPI Personal License Agreement and Terms 9, 11, and 19 of the Terms of Use, which prohibit Kalshi from using FlightAware's data for commercial purposes. As of July 16, 2026, the Terms of Use also expressly prohibited use of FlightAware's data in connection with betting, wagering, gambling, prediction markets, and event contracts.

87.    Kalshi's repeated use of the FlightAware mark in connection with those commercial gambling offerings was likewise unauthorized and infringed FlightAware's rights in the mark.

88.    On July 15, 2026, upon learning of Kalshi's unauthorized use of FlightAware's data, FlightAware cancelled Kalshi's Personal AeroAPI account and sent Kalshi a cease-and-desist letter advising that Kalshi's use of FlightAware's data violated Kalshi's legal obligations and demanding it cease misusing FlightAware's data and mark.

---

[31] Kalshi, *About*, https://kalshi.com/about (last visited Aug. 10, 2026).

30

89.     Although Kalshi represented to the media that it would stop offering these bets,[32] on July 17, 2026, Kalshi denied, by response to FlightAware's cease-and-desist letter, that it had violated FlightAware's license or infringed the FlightAware mark and asserted that its references to FlightAware constituted nominative fair use.

90.     FlightAware and Kalshi continued to correspond, with FlightAware emphasizing Kalshi's ongoing violation of the Terms of Use and Kalshi baselessly denying any such misuse.

91.     Only after receiving FlightAware's cease-and-desist letter did Kalshi add a disclaimer to its market pages. The disclaimer states that the markets and products "have not been endorsed by FlightAware LLC or its affiliates" and that references to FlightAware "are descriptive only and do not indicate an endorsement of this product or any affiliation between FlightAware LLC or its affiliates and Kalshi."

> **This market and these products have not been endorsed by FlightAware LLC or its affiliates. Any references to FlightAware, FlightAware.com, FlightAware's delay and cancellation page, or any associated marks are descriptive only and do not indicate an endorsement of this product or any affiliation between FlightAware LLC or its affiliates and Kalshi.**

92.     The disclaimer's placement varies across Kalshi's market pages. In some instances, it appears in a separate paragraph after the description of the FlightAware data used to resolve the market. In others, as shown below, it appears only after a lengthy recitation of unrelated terms and conditions, far removed from the more prominent statement that the outcome is "verified from FlightAware."

---

[32] Fortune, *Kalshi hits pause on flight cancellation contracts*, dated July 16, 2026, https://fortune.com/2026/07/16/kalshi-flight-cancellations/ (last visited Aug. 10, 2026).



93.    Regardless of where Kalshi places the disclaimer, the disclaimer does not state that FlightAware objected to Kalshi's conduct, did not authorize Kalshi to use its data or mark, and played no role in determining or verifying the outcome of the markets.

94.    As of August 10, 2026, Kalshi continues to solicit bets using FlightAware's data and repeatedly invokes the FlightAware mark despite FlightAware's express objections.

## VI.    Kalshi's Actions Have Harmed FlightAware

95.    There was considerable national news coverage of Kalshi's betting markets in reliance on FlightAware's data.

96.    News of Kalshi's proposed market for bets on airline cancellations has been met with wide public outcry, with numerous online commenters noting the safety risks posed by incentivizing speculators and bad actors to cause cancellations to profit from bets they place. For example, one X user commented:[33]



97.    Another user commented:[34]

---

[33] Matthew (@mrnuu), X (July 15, 2026, at 12:53 P.M.), https://x.com/mrnuu/status/2077451418320113679 (last visited Aug. 10, 2026).

[34] weasel (@pap3rw8), X (July 15, 2026 at 1:43 P.M.), https://x.com/pap3rw8/status/2077464089601675304 (last visited Aug. 10, 2026).



98.     In connection with the news, Airlines for America, the trade association for the major U.S. airlines, commented to Good Morning America that "[t]he safety and security of the aviation system should never be treated as a betting proposition." Good Morning America additionally reported that "the industry also warns that these bets could give bad actors an incentive to find ways to get flights cancelled so they can win big."[35] Likewise, in response to reports that Kalshi would let users place wagers on flight cancellations at New York's John F. Kennedy airport, Chris Sununu, President & CEO of Airlines for America, called Kalshi's offer "absolutely insane,"

---

[35] GOOD MORNING AMERICA, *Kalshi to let users bet on flight cancellations* (July 16, 2026), https://www.youtube.com/watch?v=3S4vlHNW3mY.

and further decried that "safety and security of the aviation system should never be a prop bet. And that can be completely manipulated."[36]

99.　　More users of X have posted public comments demonstrating their intention to punish FlightAware by turning to FlightAware's competitors for their flight geolocation needs. For example, two users on X commented the following, garnering thousands of views:[37]





[36] FOX NEWS, *Kalshi to allow bets on JFK flight cancellations: Report* (Aug. 1, 2026), https://www.youtube.com/watch?v=xpCeqjhTlRY.

[37] Austin Federa (@Austin_Federa), X (July 15, 2026, at 1:21 P.M.), https://x.com/Austin_Federa/status/2077458575496995146 (last visited Aug. 10, 2026); Olabode Anise (@JustSayO), X (July 15, 2026, at 10:40 A.M.), https://x.com/JustSayO/status/2077418093299769661 (last visited Aug. 10, 2026).

100.    FlightAware is suffering irreparable harm to its reputation as commenters mistakenly assume that FlightAware is sponsoring or otherwise collaborating with Kalshi in establishing these markets.

101.    As a company whose business depends on the safety and integrity of aviation, FlightAware is facing imminent and irreparable harm by having its data and name associated with conduct that could compromise flight operations and passenger safety.

102.    Additionally, as national news sources discussed in their reports on Kalshi's proposed flight cancellation prediction markets, Kalshi is the target of numerous state and federal lawsuits alleging it runs an illegal gambling operation and criticism that it facilitates illegal insider trading.[38] FlightAware is suffering reputational harm by being unwillingly associated with Kalshi's business, which many consumers and regulators view as illegal gambling.

103.    Kalshi's use of FlightAware's data is also harmful to the public. FlightAware's data is used by airlines and other aviation professionals in connection with the operation of air travel. A market that allows the public to wager on whether flights will be delayed or cancelled creates an incentive for participants to interfere with air travel—including by causing or contributing to flight cancellations—to profit from their wagers. Worse, wagers on flights being timely may incentivize airline, airport, or other aviation workers to cut corners to keep a flight on time. These fears are not speculative, as there have been many well-publicized incidents of nefarious manipulation of data used to settle markets. *Supra* ¶¶ 70–74. This possibility threatens the safety,

---

[38] Business Insider, *Kalshi is trying to turn flight cancellations into trades*, dated July 16, 2026, https://www.businessinsider.com/kalshi-turning-flight-cancellations-into-trades-2026-7 (last visited Aug. 10, 2026) (discussing "strong criticism from lawmakers" over insider trading); Inc.com, *Kalshi Wants You to Make Money Off of Cancelled Flights; Inside the Prediction Market's Wild New 'Sky Trading' Plan,* dated July 15, 2026), https://www.inc.com/moses-jeanfrancois/kalshi-wants-to-make-money-off-of-canceled-flights-new-sky-trading-plan/91374679 (last visited Aug. 10, 2026) (accusing Kalshi of "illegal gambling").

credibility, and reliability of the U.S. airline industry, an industry which serves approximately 2.5 to 3 million passengers each day.

## COUNT I – BREACH OF CONTRACT

104.   FlightAware repeats and realleges the allegations in the previous paragraphs as if fully set forth herein.

105.   Kalshi entered into three valid and binding agreements with FlightAware governing its use of FlightAware's data. These agreements are the Terms of Use, Terms and Conditions, and AeroAPI Personal License Agreements.

106.   Kalshi breached its obligations under at least Terms 9, 11, 19, and 20 of the Terms of Use by using FlightAware's data for commercial purposes.

107.   FlightAware has performed its obligations under the Terms of Use.

108.   Kalshi breached its obligations under the AeroAPI Personal License Agreement by using FlightAware's data for commercial purposes.

109.   FlightAware has performed its obligations under the AeroAPI Personal License Agreement.

110.   Kalshi breached its obligations under the Terms and Conditions.

111.   FlightAware has performed its obligations under the Terms and Conditions.

112.   Kalshi's breach of one or more of these contracts has caused and will continue to cause FlightAware to suffer damages, including, but not limited to, lost profits, business opportunities, reputational harm, goodwill, commercial advantage, and loss of user trust in an amount to be determined at trial.

113.   Kalshi's breach of one or more of these contracts has caused and will continue to cause FlightAware to suffer reputational harm which has no adequate remedy at law.

114.    Monetary damages would be inadequate to compensate FlightAware for the reputational harm it has suffered in connection with Kalshi's unauthorized use of FlightAware's data.

115.    Kalshi's breach was accompanied by independently tortious, egregious, and willful conduct, *infra* Count VI, directed at both FlightAware and the public, warranting punitive damages.

116.    If Kalshi does not cease using FlightAware's data, FlightAware will continue to suffer damages and irreparable harm, including, but not limited to, harm to reputation, the loss of business, loss of goodwill, and other damages for which there is no adequate remedy at law.

## COUNT II – FEDERAL TRADEMARK INFRINGEMENT
### 15 U.S.C. § 1114(1)

117.    FlightAware repeats and realleges the allegations in the previous paragraphs as if fully set forth herein.

118.    FlightAware owns valid and enforceable rights in several trademarks, including valid and incontestable registrations for its FlightAware marks.

119.    Since 2005, FlightAware has continuously used the FlightAware marks in connection with flight-tracking services and the provision of flight-status and other aviation information. Kalshi republishes that same flight information in connection with its contracts and identifies FlightAware as the source used to determine their outcomes. FlightAware's use of FlightAware's marks in connection with its services predates any use by Kalshi.

120.    FlightAware has not authorized, licensed, or otherwise condoned or consented to Kalshi's use of the FlightAware marks.

121.    Kalshi's unauthorized use in commerce of the FlightAware marks is likely to deceive consumers as to the origin, source, sponsorship, or affiliation of Kalshi's services, and is

38

likely to cause consumers to believe, contrary to fact, that Kalshi's services are offered, sold, authorized, endorsed, or sponsored by FlightAware, or that Kalshi is in some way affiliated with, endorsed by, or sponsored by FlightAware.

122.    Kalshi's actions constitute trademark infringement, in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

123.    Kalshi's conduct has occurred in interstate commerce and substantially impacts interstate commerce.

124.    Kalshi has committed the foregoing acts of infringement with full knowledge of FlightAware's prior rights in the FlightAware marks and with the willful intent to cause confusion and trade on FlightAware's reputation or goodwill.

125.    Though Kalshi had prior knowledge of FlightAware, as well as its trademarks, and received notice from FlightAware that Kalshi was infringing FlightAware's marks, Kalshi continues to intentionally infringe the FlightAware marks.

126.    Kalshi's conduct is causing immediate and irreparable harm and injury to FlightAware and to its goodwill and reputation and will continue to both damage FlightAware and confuse the public unless enjoined by this court. FlightAware has no adequate remedy at law.

127.    FlightAware is entitled to, among other relief, injunctive relief and an award of actual damages, Defendant's profits, enhanced damages and profits, reasonable attorneys' fees, and costs of the action under Sections 34 and 35 of the Lanham Act, 15 U.S.C. §§ 1116, 1117, together with prejudgment and post-judgment interest.

## COUNT III – INJURY TO BUSINESS REPUTATION
### N.Y. GEN. BUS. LAW § 360-L

128.    FlightAware repeats and realleges the allegations in the previous paragraphs as if fully set forth herein.

39

129.    FlightAware is the owner of the FlightAware marks, as alleged in this Complaint. The FlightAware marks are distinctive and have acquired secondary meaning.

130.    Kalshi's unauthorized use of FlightAware's marks is likely to injure FlightAware's business reputation by creating negative associations between the marks and Kalshi's services.

131.    Kalshi's conduct is likely to tarnish the FlightAware marks and violates New York General Business Law § 360-l.

132.    Kalshi's conduct has caused and, unless enjoined, will continue to cause irreparable injury to FlightAware's business reputation and the goodwill associated with the FlightAware marks.

133.    FlightAware is entitled to injunctive relief under New York General Business Law § 360-l.

## COUNT IV – UNFAIR COMPETITION
### 15 U.S.C. § 1125(a)(1)(A)

134.    FlightAware repeats and realleges the allegations in the previous paragraphs as if fully set forth herein.

135.    Kalshi has used and continues to use the FlightAware marks in interstate commerce in connection with the advertising, promotion, offering, sale, and operation of its services, including its flight-cancellation prediction markets.

136.    Kalshi's unauthorized use of the FlightAware marks constitutes a false designation of origin and a false or misleading description or representation of fact.

137.    Kalshi's conduct constitutes unfair competition in violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

138. Kalshi has committed the foregoing acts of infringement with full knowledge of FlightAware's prior rights in the FlightAware marks and with the willful intent to cause confusion and trade on FlightAware's reputation or goodwill.

139. Though Kalshi had prior knowledge of FlightAware, as well as its trademarks, and received notice from FlightAware that Kalshi was infringing FlightAware's marks, Kalshi continues to intentionally infringe the FlightAware mark.

140. Kalshi's conduct is causing immediate and irreparable harm and injury to FlightAware and to its goodwill and reputation and will continue to both damage FlightAware and confuse the public unless enjoined by this court. FlightAware has no adequate remedy at law.

141. FlightAware is entitled to, among other relief, injunctive relief and an award of actual damages, Kalshi's profits, enhanced damages and profits, reasonable attorneys' fees, and costs of the action under Sections 34 and 35 of the Lanham Act, 15 U.S.C. §§ 1116, 1117, together with prejudgment and post-judgment interest.

## COUNT V – UNJUST ENRICHMENT

### [Pled in the Alternative]

142. FlightAware repeats and realleges the allegations in the previous paragraphs as if fully set forth herein.

143. Kalshi has informed FlightAware that it disputes the scope or applicability of the operative contracts.

144. Kalshi has been unjustly enriched at FlightAware's expense, and equity and good conscience militate against Kalshi retaining the benefits it has obtained.

145. FlightAware has expended substantial resources to compile data verifying the location and timeliness of flights, including entering commercial contracts, maintaining

41

relationships with commercial aviation companies, building and maintaining infrastructure to receive ADS-B data, and employing 75 software engineers, data analysts, IT infrastructure engineers, and other technicians to verify, interpret, and format the data.

146. By willfully using FlightAware's data to solicit bets from their customers, Kalshi gained access to and improperly used FlightAware's data for a commercial purpose, from which use Kalshi has been unjustly enriched at FlightAware's expense.

147. As a result, FlightAware has been injured and suffered damages, including, but not limited to, lost profits, business opportunities, reputational harm, goodwill, commercial advantage, and loss of user trust.

148. Kalshi's conduct violates federal law, as detailed herein, and is independently unjust conduct that also violates the state common law of New York.

149. Equity and good conscience demand that the unjust benefits that Kalshi has received should be repaid to FlightAware.

## <u>COUNT VI – NEW YORK UNFAIR COMPETITION</u>

150. FlightAware repeats and realleges the allegations in the previous paragraphs as if fully set forth herein.

151. Kalshi, through its actions as outlined above, has misappropriated FlightAware's labor, skill, expenditures, and/or goodwill, and has displayed bad faith in doing so.

152. Kalshi, through its actions as outlined above, has committed trademark infringement and has displayed bad faith in doing so.

153. By using FlightAware's data to solicit bets from their customers, Kalshi has brazenly disregarded the appropriate use for said data in which FlightAware has invested considerable resources, and in doing so, misappropriated FlightAware's content and services for their own commercial gain.

154.    Kalshi has taken the actions outlined above in order to secure for Kalshi an undue competitive advantage, or to damage FlightAware's competitive position, including by (a) using FlightAware's data for a commercial purpose without authorization, thereby avoiding the need for any licensing agreement or other commercial arrangement to which FlightAware would be entitled in the marketplace, and reducing the value and desirability of such agreements or arrangements; (b) diminishing the value of the services FlightAware provides to its customers; and (c) jeopardizing the safety of commercial aviation, which threatens FlightAware's business reputation and threatens its ability to provide said data to its customers.

155.    Kalshi's conduct violates federal law, as detailed above, and is independently unfair conduct that also violates the state common law of New York.

156.    As detailed above, Kalshi has acted in bad faith by knowingly using FlightAware's data for commercial purposes and infringing on FlightAware's registered marks after receiving a cease-and-desist letter and/or by continuing to use FlightAware's data after having been blocked from access or otherwise requested to cease activities.

157.    Kalshi's misconduct is willful and entitles FlightAware to punitive damages.

158.    As a result, FlightAware has been injured and suffered damages, including, but not limited to, lost profits, business opportunities, reputational harm, goodwill, commercial advantage, and loss of user trust.

## **PRAYER FOR RELIEF**

WHEREFORE, FlightAware demands a trial by jury and a judgment against Kalshi as follows:

a.    A temporary restraining order and preliminary and permanent injunctions enjoining Kalshi from engaging in any of the activity complained of herein or from causing any of the injury complained of herein;

43

b. Awarding FlightAware damages for all injuries suffered as a result of Kalshi's unlawful acts complained of herein, including punitive damages;

c. Requiring Defendants to account for and disgorge all profits attributable to their unauthorized use of the FlightAware marks;

d. Awarding FlightAware its actual damages and any enhanced damages permitted under the Lanham Act, including an award of up to three times FlightAware's actual damages as the Court deems just;

e. Restitution and disgorgement of all benefits Kalshi obtained through its unauthorized and inequitable use of FlightAware's data;

f. Pre-judgment and post-judgment interest at the maximum rate permitted by law;

g. Costs of this action, including attorneys' fees; and

h. Such other legal and equitable relief as this Court deems just and proper.

Dated: August 10, 2026
New York, New York

Respectfully submitted,

*/s/ William A. Maher*
William A. Maher
Justin T. Zimnoch
**WOLLMUTH MAHER & DEUTSCH LLP**
500 Fifth Avenue
New York, NY 10110
(212) 382-3300
wmaher@wmd-law.com
jzimnoch@wmd-law.com

Jason L. Peltz (*Pro Hac Vice* Forthcoming)
Asha L.I. Spencer (*Pro Hac Vice* Forthcoming)
Rachel E. Smith (*Pro Hac Vice* Forthcoming)
**BARTLIT BECK LLP**
54 W. Hubbard Street, Suite 300
Chicago, IL 60654
(312) 494-4400
jason.peltz@bartlitbeck.com
asha.spencer@bartlitbeck.com
rachel.smith@bartlitbeck.com

Giovanni J. Sanchez (*Pro Hac Vice* Forthcoming)
**BARTLIT BECK LLP**
1801 Wewatta St., Suite 1200
Denver, CO 80202
(303) 592-3100
giovanni.sanchez@bartlitbeck.com

*Attorneys for FlightAware LLC*

45